UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CREATIVE SERVICES, INC., \* \* \* Plaintiff, \* \* v. \* \* THE HARTFORD FIRE INSURANCE \* COMPANY, \* \* Defendant. \* \* | Civil Action No. 20-cv-11720-ADB |

## **MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiff Creative Services, Inc. ("CSI") brings this action against its insurer, Defendant The Hartford Fire Insurance Company ("Hartford"), alleging breach of contract based on Hartford's denial of coverage under CSI's commercial business owner's insurance policy (the "Policy"). [ECF No. 1 ("Compl.")]. Currently before the Court are the parties' cross-motions for summary judgment. [ECF Nos. 16 (CSI), 24 (Hartford)]. Although the Court recognizes the adversity that businesses have confronted during the COVID-19 pandemic and is sympathetic to CSI's position, the Court must find in Hartford's favor based on the reasoning in the recent ruling of the Supreme Judicial Court of Massachusetts ("SJC") in Verveine Corp. v. Strathmore Ins. Co., 184 N.E.3d 1266 (Mass. 2022) and three related holdings from the First Circuit.

Accordingly, CSI's motion, [ECF No. 16], is DENIED, and Hartford's motion, [ECF No. 24], is GRANTED.

I.      **BACKGROUND**

      A.      **Factual Background**

Unless otherwise noted, the following facts are undisputed.[1]

CSI is a Massachusetts corporation that conducts commercial background screening. [ECF No. 31-1 at 1]. Hartford is a Connecticut corporation that provides insurance. [Id.]. The Policy covered CSI properties in Mansfield, Massachusetts; Chapin, South Carolina; Providence, Rhode Island; and Warrensville Heights, Ohio (the "Covered Premises") for the period from October 19, 2019 through October 19, 2020. [Id. at 2, 4].

On March 23, 2020, the Governor of Massachusetts issued COVID-19 Order No. 13 (the "Massachusetts Order"). [ECF No. 17-2]. Pursuant to the Massachusetts Order, non-essential businesses, such as CSI, were required to "close their physical workplaces and facilities . . . to workers, customers, and the public as of 12:00 noon on March 24, 2020 and [could] not re-open to workers, customers, or the public before 12:00 noon on April 7, 2020." [Id. at 2]. On March 31, 2020, the Governor replaced the April 7, 2020 end-date with May 4, 2020. [ECF No. 17-3 at 2–3]. The Governors of Ohio and South Carolina issued similar orders (together with the Massachusetts Order, the "Shutdown Orders"). [ECF No. 1-5 (initial Ohio order); ECF No. 1-6 (Ohio order extending end-date); ECF No. 1-7 (initial South Carolina order); ECF Nos. 1-8, 1-9 (subsequent South Carolina orders)]. CSI alleges that the Shutdown Orders forced it to close and suspend operations at its Mansfield, Massachusetts, Warrensville Heights, Ohio, and Chapin, South Carolina locations from March 23, 2020 through May 24, 2020. [Compl. ¶¶ 13, 16, 21,

---

[1] The Court draws the facts primarily from CSI's rebuttal to Hartford's Local Rule 56.1 statement, [ECF No. 31-1], which contains both parties' positions on the material facts, and the documents referenced therein.

23]. On May 1, 2020, CSI requested coverage under the Policy, which Hartford denied. [ECF No. 31-1 at 7].

### B. Procedural Background

On September 18, 2020, CSI sued Hartford, alleging that Hartford breached its obligations under the Policy by denying coverage. [Compl. ¶ 39.]. Specifically, CSI maintains that, due to the Shutdown Orders, it experienced a "direct physical loss and access to [the Covered Premises] covered under the [P]olicy." [Id. at 1]. After Hartford answered, [ECF No. 11], CSI moved for summary judgment, [ECF No. 16], and Hartford opposed and cross-moved, [ECF No. 24]. On May 21, 2021, this case was stayed by agreement of the parties pending resolution of the appeal in Legal Sea Foods, LLC v. Strathmore Ins. Co., No. 21-1202 (1st Cir. 2022), involving similar facts. [ECF No. 52]. Legal Sea Foods was in turn stayed pending resolution of yet another similar matter before the SJC, Verveine. On April 21, 2022, the SJC issued its decision in Verveine, 184 N.E.3d 1266, and a decision from the First Circuit in Legal Sea Foods followed thereafter, 36 F.4th 29 (1st Cir. June 3, 2022). On June 13, 2022, this Court lifted the stay on the instant action. [ECF No. 58]. The parties have filed oppositions, replies, notices of supplemental authority, and responses thereto, see [ECF Nos. 26, 31, 32, 33, 34, 37, 38, 39, 40, 41, 42, 43, 50, 53, 55, 57], and the dueling motions are ripe for resolution.

## II. DISCUSSION

### A. Massachusetts Law Governs

As a preliminary matter, the Court must decide which state's law governs the terms of the Policy. Neither party points to a choice-of-law provision in the Policy, and, based on the Court's review, there does not appear to be one. CSI asserts diversity jurisdiction. [Compl. ¶ 3]. "When exercising diversity jurisdiction, federal courts apply the choice-of-law rules of the forum state."

3

Alharbi v. Theblaze, Inc., 199 F. Supp. 3d 334, 360 (D. Mass. 2016) (citing In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012)). Under Massachusetts' choice-of-law rules, "the rights created by a contract of casualty insurance are to be determined by the local law of the State that the parties to the insurance contract understood would be the principal location of the insured risk during the term of the policy, unless some other State has a more significant relationship . . . ." Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co., 803 N.E.2d 750, 753 (Mass. App. Ct. 2004). Although the Policy covers properties in four different states, the Court finds that the principal location of the insured risk is Massachusetts. First, CSI's principal place of business is in Massachusetts. [ECF No. 31-1 at 1]. Second, the Mansfield, Massachusetts location clearly accounts for the bulk of the value insured by the Policy. Compare [ECF No. 17-1 at 17–18 (insuring Massachusetts building for approximately $1.1 million, personal property inside the building for $340,300, computers and media for $150,000)], with [id. at 19–20 (not insuring South Carolina building, and insuring personal property inside the building for only $50,000 and computers and media for only $25,000)], [id. at 21–22 (not insuring Rhode Island building or computers and media, and insuring personal property inside the building for only $1)], and [id. at 23–24 (not insuring Ohio building or computers and media, and insuring personal property inside the building for only $31,400)]. Accordingly, the Court finds that Massachusetts law governs the Policy.

    **B.**    **The Policy Does Not Provide Coverage**

Under Massachusetts law,

> [t]he interpretation of an insurance contract is a question of law. It is no different from the interpretation of any other contract, and [courts] must construe the words of the policy in their usual and ordinary sense. [Courts] read the policy as written and are not free to revise it or change the order of the words. Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable, without according undue

4

> emphasis to any particular part over another.  If in doubt, [courts] consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.  Finally, [a]ny ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured.

Bos. Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 304–05 (Mass. 2009) (final alteration in original) (citations and internal quotation marks omitted).  "An ambiguity 'arises when there is more than one rational interpretation of the relevant policy language,' but 'is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other.'"  Kamakura, LLC v. Greater N.Y. Mut. Ins. Co., 525 F. Supp. 3d 273, 279–80 (D. Mass. 2021) (quoting Bos. Gas, 910 N.E.2d at 305 n.32).  In insurance disputes, "[t]he insured bears the initial burden of 'prov[ing] that the loss [is] within the description of the risks covered.'"  Highlands Ins. Co. v. Aerovox Inc., 676 N.E.2d 801, 804 (Mass. 1997) (second and third alterations in original) (quoting Tumblin v. Am. Ins. Co., 182 N.E.2d 306, 307–08 (Mass. 1962)).

CSI argues that it is entitled to coverage under the "Business Income" provision of the Policy because it suffered a "direct physical loss . . . of property at the [Covered Premises]," within the meaning of the Business Income provision, when it could no longer physically use its property because of the Shutdown Orders.  [ECF No. 17 at 6–14].[2]  Hartford counters that CSI is

---

[2] In its opening brief, CSI seems to also assert that the COVID-19 virus caused physical damage to property at the Covered Premises.  See [ECF No. 17 at 14 ("The virus is on surfaces, including building surfaces, from which the virus can come into contact with people.  The question, therefore, insofar as coverage is concerned, is whether the virus, when it is on building surfaces, constitutes damage to the building.  The answer is, yes it does.  As a result, coverage exists not only because of the 'loss of' language in the policy (discussed above), but also because of the 'damage' language in the policy.")].  In subsequent filings, however, CSI abandons this argument.  See [ECF No. 37 at 2 ("CSI is also not contending . . . that the virus caused physical damage to property . . . CSI is seeking coverage solely for the physical loss of use of its building caused by the government directive that prohibited CSI from using its building")].  Accordingly, the Court will not consider whether the suspension of CSI's operations was caused by direct physical damage to property at the Covered Premises.  Nevertheless, the Court notes that the SJC

not entitled to coverage because it experienced no "direct physical loss of or physical damage to its property" and that the Shutdown Orders do not constitute a "direct physical loss" of any property. [ECF No. 26 at 12–22].

The "Business Income" provision of the Policy states that

> [Hartford] will pay for the actual loss of Business Income [CSI] sustain[s] due to the necessary suspension³ of [its] "operations"⁴ during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the [Covered Premises],⁵ including personal property in the open (or in a vehicle) within 1,000 feet of the [Covered Premises], caused by or resulting from a Covered Cause of Loss.

[ECF No. 17-1 at 45].

The question, therefore, is whether the suspension of CSI's operations was "caused by direct physical loss of or physical damage to property at the [Covered Premises]." Because the SJC answered this question in the negative in <u>Verveine</u>, this Court must do the same, with the result that CSI's claim is effectively foreclosed.

---

has since rejected such an argument. <u>Verveine</u>, 184 N.E. 3d at 1276 (the mere presence of the COVID-19 virus does not amount to damage to the property because of the virus's "[e]vanescent presence," meaning that it quickly dissipates on its own or can be removed by a simple cleaning); <u>see also</u> <u>Legal Sea Foods</u>, 36 F.4th at 35 (insurance claim not viable where the insured "allege[s] no more than a presence of the virus that is evanescent or that results in contamination of surfaces that may be addressed through simple cleaning[]").

³ Under the Policy, "suspension" means the "partial slowdown or complete cessation of [CSI's] business activities; or [t]hat part or all of the [Covered Premises] is rendered untentantable [sic] as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy." [ECF No. 17-1 at 45].

⁴ "Operations" is defined as "business activities occurring at the [Covered Premises] and tenantability of the [Covered Premises]."  [ECF No. 17-1 at 59].

⁵ The Policy does not define "direct," "physical," "loss," "damage," or the phrase "direct physical loss of or physical damage to." <u>See</u> [ECF No. 17-1].

6

In Verveine, the owners of three restaurants challenged the denial of their property insurance claims for losses resulting from the COVID-19 pandemic. 184 N.E.3d at 1270. Affirming the trial court's dismissal of plaintiffs' claims against their insurer, the SJC concluded that the policy term "direct physical loss of or damage to" required "some distinct, demonstrable, physical alteration of the property," id. at 1275 (citation omitted), and accordingly found that "the suspension of business at the restaurants was not in any way attributable to a direct physical effect on the plaintiffs' property that can be described as loss or damage[,]" whether that was due to the presence of the virus itself or due to Shutdown orders, id. at 1276. The SJC, in part, relied on the policy's definition of "period of restoration," which stated that coverage would end on "(1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location." Id. at 1275. This language, the SJC concluded, indicated "that the property has *not* experienced physical loss or damage in the first place *unless* there needs to be active repair or remediation measures to correct the claimed damage . . . ." Id. (emphasis added). Because the "losses" alleged as a result of the pandemic did not require repair or remediation, the covered property had not suffered the type of "direct physical loss or damage" envisioned by the policy.

The plaintiffs in Verveine urged that the policy language offering coverage for both "loss" *or* "damage" must mean that "loss" should have a different, broader scope than "damage" that would not include physical alteration of the property, such as loss of use or loss of function. Id. at 1276–77. The SJC rejected this argument, finding the distinction inapposite considering the facts before it. Id. "Physical," according to the Court, defined the loss itself, not the cause, and thus always demands a "direct, physical deprivation of possession[,]" meaning that while

7

there may exist a total "loss" of property without damage, such as a theft for example, this distinction is not relevant in the context of the claims here, where plaintiffs were never wholly deprived of possession of their property. Id. at 1277.

Following Verveine, the First Circuit issued three opinions affirming lower court denials of coverage on similar grounds. In each case, the First Circuit, applying the reasoning in Verveine, interpreted the phrase "direct physical loss of or damage to property" to deny coverage to insureds in connection with insurance disputes arising from the COVID-19 pandemic.

In Legal Sea Foods, a restaurant chain sued its insurer for denying coverage under the business interruption provision of its commercial property insurance policy for losses purportedly caused by government shutdown directives issued in connection with the pandemic. 36 F.4th at 30–32. The District Court concluded that the policy language "direct physical loss" requires "some kind of tangible, material loss" and that because the "COVID-19 virus does not impact the structural integrity of property," it "cannot constitute 'direct physical loss of or damage to' property." Legal Sea Foods, LLC v. Strathmore Ins. Co., 523 F. Supp. 3d 147, 152 (D. Mass. 2021). Though Verveine did not espouse this exact "structural integrity" requirement, the First Circuit nevertheless found that the SJC's conclusion—that the virus does not cause "direct physical loss of or damage to" property within the meaning of the insurance policies— applied equally given the identical policy language and analogous factual allegations. Legal Sea Foods, 36 F.4th at 35. The First Circuit also concluded that Verveine foreclosed plaintiff's suggestion that there was an ambiguity in the policy language and further found that "loss of use" of the premises, whether alleged in part or in full, could not amount to physical loss or damage within the meaning of the policy language where the plaintiff was never fully denied access to or possession of its premises. Id. at 36.

The First Circuit came to the same conclusion in SAS Int'l, Ltd. v. Gen. Star Indem. Co. 36 F.4th 24, 24–29 (1st Cir. June 3, 2022) and Am. Food Sys., Inc. v. Fireman's Fund Ins. Co., 21-1307 (1st Cir. June 3, 2022). In SAS, a real estate business sued its insurer for denying coverage under a commercial lines policy, claiming that it had suffered financial losses as a result of having to shut down its premises because of the COVID-19 pandemic. 36 F.4th at 24–29. As in Legal Sea Foods, the District Court granted the insurer's motion to dismiss, SAS Int'l, Ltd. v. Gen. Star Indem. Co., 520 F. Supp. 3d 140, 141 (D. Mass. 2021), and the First Circuit affirmed, agreeing that the alleged "losses" from the pandemic could not give rise to a "direct physical loss" under Verveine, and that there was no ambiguity in the policy language that suggested an alternative conclusion. 36 F.4th 27–29. In Am. Food Sys., the First Circuit similarly held that restaurant owners' claims against their insurer failed because the pandemic did not cause "direct physical loss of or damage to property" within the meaning of the insurance policies. 21-1307 (1st Cir. June 3, 2022). [6]

---

[6] There has been no shortage of similar cases among courts in this District. As examples, roughly a month after issuing his decision in Legal Sea Foods, District Judge Gorton reached the same conclusion in a putative class action concerning business interruption losses related to the COVID-19 pandemic. Select Hosp., LLC v. Strathmore Ins. Co., 533 F. Supp. 3d 31, 36 (D. Mass. Apr. 7, 2021) ("The COVID-19 virus does not impact the structural integrity of property in a manner contemplated by the Policy and thus cannot constitute 'direct physical loss of or damage to' property."). The insured in that case, like CSI, alleged that government shutdown directives impacted its ability to use its property. Id. at 34. Notably, after the Verveine opinion issued, plaintiff voluntarily dismissed its case and withdrew its appeal. See Select Hosp., LLC, 20-cv-11414, Dkt. Nos. 41–43.

In Kamakura, two Boston restaurants sued their insurer, seeking a declaratory judgment that the losses that they sustained because of the Massachusetts COVID-related shutdown orders were covered under their insurance policies. 525 F. Supp. 3d at 277–79. In granting the insurer's motion to dismiss, Chief Judge Saylor found that, "taken as a whole, it is clear that the policies do not provide coverage for financial or other intangible losses" where there is not "a 'physical' loss of or damage to a tangible object, such as the structure of a building." Id. at 280. Further, foreshadowing the SJC's eventual holding in Verveine, he concluded that although the "spread of the coronavirus is of course 'physical' in the sense that the virus is a submicroscopic

As an initial matter, the Court recognizes that the policy language here is not identical to the policy language in SAS, Legal Sea Foods, Kamakura, and Verveine because the Policy includes the word "physical" before "damage" and the policies in those cases did not. See [ECF No. 17-1 at 45]. The Court finds, however, that this minor difference does not compel a different outcome, especially where CSI relies on the phrase "direct physical loss" not "physical damage." If anything, the inclusion of the word "physical" before "damage" makes it even clearer that CSI's coverage under the Business Income provision is not triggered unless its suspension of operations is tied to some physical effect on property at the Covered Premises.

The Policy's definition of "period of restoration" lends further support to the Court's finding that there is no coverage. Here, as in Verveine, the fact that the "period of restoration" ends on the date when the property is (or should be) "repaired, rebuilt or replaced" or when the insured's "business is resumed at a new, permanent location" demonstrates that the "direct physical loss or physical damage to the property" contemplated by the Policy is tangible and perceptible. [ECF No. 17-1 at 59–60]. There was nothing in the Covered Premises that needed to be "repaired, rebuilt or replaced" and there was no need for CSI to resume its business at a different location. See Verveine, 184 N.E.3d at 1275; see also DeMoura v. Cont'l Cas. Co., 523 F. Supp. 3d 314, 321 (E.D.N.Y. 2021) ("Both the Business Income and Extra Expense coverage limit the duration of coverage to the 'period of restoration,' which 'begins with the date of direct physical loss or damage' and ends either when the property is 'repaired, rebuilt or replaced' or when the business relocates . . . . Because something must first be physically damaged in order to

---

organism, . . . under the plain language of the policy, it is the loss or damage itself that must be 'physical,'" and the fact that the restaurant's property was unusable—either because of the virus itself or the government's shutdown orders—did not qualify as physical loss. Id. at 281. Once again, plaintiff withdrew its appeal after the Verveine holding issued. See Kamakura, No. 20-cv-11350, Dkt. Nos. 54–56.

be 'restore[d] to a sound or good condition' or 'fix[ed]' it follows from the plain language of the Policy that 'physical loss of or damage to' requires a change to the real, tangible property at issue for coverage to apply." (alterations in original)).

CSI's more recent attempt to distinguish SAS, Legal Sea Foods, Kamakura, Am. Food Sys., and Select Hospitality by arguing that the insureds in those cases asserted that the virus itself, as opposed to a government directive, prevented them from being able to use their buildings also fails. [ECF Nos. 37 at 2 (attempting to distinguish SAS and Legal Sea Foods), 40 (attempting to distinguish Am. Food Sys. and Kamakura), 42 (attempting to distinguish Select Hospitality)]. Ultimately, this distinction is meaningless because in each of these cases the insured was not entitled to coverage because its property was not physically affected either by the virus itself or by government directives related to the virus. See also Verveine, 184 N.E.3d at 1276 ("[T]he COVID-19 orders standing alone cannot possibly constitute 'direct physical loss of or damage to' property, for the same reason that loss of legal title or other government restrictions cannot themselves physically alter property."). Moreover, to the extent CSI seeks to draw a distinction between this case and Legal Sea Foods or Verveine, because, unlike CSI, the restaurants in those cases could use their properties in a limited capacity despite the government shutdown directives, that argument is equally unavailing. Distinguishing between partial or total loss of use is meaningless where the decision turns on the fact that there was not a "direct physical loss" of any degree.

Beyond attempting to differentiate the cases discussed above, CSI makes other arguments in favor of coverage, but each is unavailing.

First, CSI argues that because the Policy is ambiguous, to obtain coverage, it need only advance a reasonable interpretation of the Policy that supports its position. [ECF No. 17 at 4–6].

Although CSI's statement of law is correct, for the reasons articulated in this Order, the Court finds that there is only one reasonable interpretation of the relevant policy language: Hartford's. See Verveine, 184 N.E.3d at 1274 (concluding that there was "no reasonable interpretation of direct physical loss of or damage to property [that] supports the plaintiffs' claims"). Despite its best attempts, CSI cannot manufacture an ambiguity where there is none. See Kamakura, 525 F. Supp. 3d at 279–80 ("An ambiguity 'arises when there is more than one rational interpretation of the relevant policy language,' but 'is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other.'" (quoting Bos. Gas, 910 N.E.2d at 305 n.32)). The Court also notes that, contrary to the position CSI appears to take, see [ECF No. 17 at 18], the mere existence of out-of-state cases finding in favor of similarly-situated insureds does not automatically render the Policy language ambiguous and CSI's interpretation reasonable. See e.g., Kamakura, 525 F. Supp. 3d at 283–84 (acknowledging contrary case law but still finding that "the plain language of the policies does not create any ambiguity"); SAS, 520 F. Supp. 3d at 143–44; Legal Sea Foods, 523 F.Supp.3d 147 at 151–53.

 Next, CSI reiterates the argument heard in Verveine and Kamakura that the phrase "loss of . . . the property at the [Covered Premises]" means "loss of the use . . . of the property at the [Covered Premises]." [ECF No. 17 at 7–14]. The Court, however, agrees with the SJC's sound reasoning on this point. Although "loss" can mean "loss of use," CSI ignores the words "direct physical," which modify "loss." Here, the Shutdown Orders did not result in "a direct physical loss of the use" of any property at the Covered Premises. The Shutdown Orders—unlike, for example, a fire—did not physically prevent CSI from using the Covered Premises. The fact that CSI may have been exposed to civil or criminal liability for disobeying the Shutdown Orders, see [ECF No. 17-2 at 4 (Massachusetts Order noting potential criminal penalty and civil fine)], does

12

not mean that the Shutdown Orders were a physical impediment to CSI's use of the Covered Premises.  Further, CSI's reliance on North State Deli, LLC v. The Cincinnati Ins. Co., No. 20-cv-02569, 2020 WL 6281507 (N.C. Super. Ct. Oct. 2020) for the proposition that loss of use, without any physical damage, is sufficient to trigger coverage, see [ECF No. 17 at 10–11], is misplaced, particularly in light of Verveine and the First Circuit's endorsement of Verveine. First, not only is North State Deli a non-binding, trial court decision from North Carolina that interprets an insurance policy under North Carolina law, but second, and critically, that decision was reversed and remanded by the North Carolina Court of Appeals, which held, in line with the majority of courts, that "Plaintiffs' desired definition of 'physical loss' as a general 'loss of use' is not supported by [North Carolina] caselaw or the unambiguous language in the Policies[,]" and directed the trial court to enter summary judgment in favor of defendants, North State Deli, LLC v. The Cincinnati Ins. Co., No. 21-coa-293, 2022 WL 2432157 at *2 (N.C. Ct. App. July 5, 2022).[7]

---

[7] CSI has submitted additional cases to the Court as supplemental authorities in its favor.  See [ECF Nos. 38 (submitting Ungarean, DMD v. CNA, No. 20-gd-006544, 2021 WL 1164836 (Pa. Com. Pl. Mar. 25, 2021)), 50 (submitting Hegedus, Inc. v. ACE Fire Underwriters Ins. Co., 538 F. Supp. 3d 457 (E.D. Pa. May 7, 2021)), 53 (submitting MacMiles, LLC d/b/a Grant Street Tavern v. Erie Insurance Exchange, 20-cv-7753, 2021 WL 3079941 (Pa. Com. Pl. May 25, 2021))].  Each of those cases, however, is a similarly non-binding, trial court decision applying non-Massachusetts law and has also been called into question by other courts.  See, e.g., Chester Cnty. Sports Arena v. Cincinnati Specialty Underwriters Ins. Co., 530 F. Supp. 3d 546, 554 (E.D. Pa. 2021) (addressing Ungarean); Lansdale 329 Prop, LLC v. Hartford Underwriters Ins. Co., 537 F. Supp. 3d 780, 794 n.9 (E.D. Pa. 2021) (same); Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co., 539 F. Supp. 3d 409, 418 n.4 (E.D. Pa. 2021) (addressing Hegedus); Cosm. Laser, Inc. v. Twin City Fire Ins. Co., 554 F. Supp. 3d 389, 408 n.16 (D. Conn. 2021) (addressing MacMiles).  MacMiles is all the more distinguishable because the "period of restoration" provision in the policy at issue in that case was different, ending either when "Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property." 2021 WL 3079941 at *7.

In sum, in the face of clear and unambiguous policy language and an overwhelming body of unfavorable case law, including recent decisions from this circuit and Massachusetts' highest appellate court, CSI's attempts to create an ambiguity and advance a favorable interpretation of the Business Income provision necessarily fail.  As noted above, the key question is whether the suspension of CSI's operations was "caused by direct physical loss of or physical damage to property at the [Covered Premises]."  Because a COVID-related government directive that precludes a property-owner from utilizing its property is not a "direct physical loss of property," there is no coverage.[8]  Indeed, the SJC, in holding in favor of the insurer, emphasized that "[e]very appellate court that has been asked to review COVID-19 insurance claims has agreed with this definition for this language or its equivalent."  Verveine, 184 N.E.3d at 1275 (collecting cases); see Kamakura, 525 F. Supp. 3d at 281–82 (similar).

## III.    CONCLUSION

Accordingly, for the reasons noted above, CSI's motion for summary judgment, [ECF No. 16], is DENIED, and Hartford's motion for summary judgment, [ECF No. 24], is GRANTED.

**SO ORDERED.**

July 7, 2022                                                                /s/ Allison D. Burroughs
                                                                                    ALLISON D. BURROUGHS
                                                                                    U.S. DISTRICT JUDGE

---

[8] The Policy contains an exclusion for certain virus-related losses.  See [ECF No. 17-1 at 112].  Because the Court finds that there is no coverage under the Policy, it need not consider the parties' arguments regarding the potential applicability of the virus exclusion.  Cf. Somerset Sav. Bank v. Chi. Title Ins. Co., 649 N.E.2d 1123, 1128 (Mass. 1995) (noting that once a court has found that a claim is not covered under a policy, it need not consider exclusions).